**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE ECOLOGY CENTER, INC., a
non-profit Montana corporation, THE
AQUARIUS ESCALANTE
FOUNDATION, a non-profit Utah
corporation,

        Plaintiffs - Appellants,

v.

UNITED STATES FOREST
SERVICE, an agency of the U.S.
Department of Agriculture; UTAH
ENVIRONMENTAL CONGRESS;
ROBERT A. RUSSELL, Forest
Supervisor, Dixie National Forest;
STEPHEN R. ROBERTSON, Acting
Forest Supervisor, Dixie National
Forest; DALE BOSWORTH, Chief of
the Forest Service,

        Defendants - Appellees.

No. 05-4101

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CV-589-TS)**

---

Thomas J. Woodbury, Forest Defense, P.C., Missoula, MT, for Plaintiffs-
Appellants.

Michael T. Gray, United States Department of Justice, Environmental & Natural
Resources Division, Washington, D.C., (Mark Haag, Department of Justice,
Environment & Natural Resources Division, Washington, D.C.; Kelly A. Johnson,

Acting Assistant Attorney General, Department of Justice, Washington D.C.; and Elise Foster, United States Department of Agriculture, Washington, D.C., with him on the brief), for Defendants-Appellees.

---

Before **HENRY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**HENRY,** Circuit Judge.

---

Plaintiffs Ecology Center and the Aquarius Escalante Foundation (together, "Ecology Center") filed a complaint in the United States District Court for the District of Utah. Ecology Center sought declaratory and injunctive relief to stop the Griffin Springs Resources Management Project ("the Project"), which would allow logging in the Griffin Springs area. Ecology Center claimed that the Project's Record of Decision did not comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f; the National Forest Management Act of 1976, 16 U.S.C. § 1600-1614; and the Administrative Procedures Act, 5 U.S.C. §§ 701-706. The district court found the Forest Service's approval of the Project neither arbitrary nor capricious and dismissed the complaint. Ecology Center timely appealed.

For the reasons stated below, we affirm in part, reverse in part, and remand in part.

## I. BACKGROUND

A.    Statutory and Regulatory Framework

1.    NEPA's procedural requirements

NEPA established a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. "NEPA itself does not mandate particular results" in order to accomplish these ends. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Rather, NEPA imposes procedural requirements on federal agencies with a particular focus on requiring agencies to analyze the environmental impact of their proposals and actions. *See id*. at 349-53.

NEPA requires that federal agencies prepare an environmental impact statement ("EIS") for certain major federal actions significantly affecting the quality of the human environment. The EIS must include a

> detailed statement by the responsible official on--(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

2.    National Forest Management Act's requirements

The National Forest Management Act of 1976 requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a). The Forest Service, which manages the national forest system, develops land and resource management plans pursuant to the National Forest Management Act. The National Forest Management Act also requires that forest plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area."  *Id.* § 1604(g)(3)(B).

The Project is located in the Dixie National Forest in Utah.  Management activities of the Dixie National Forest are governed by the Dixie National Forest Plan ("the Plan"), adopted in 1986.  The Plan includes both a habitat approach (which incorporates habitat management recommendations to preserve and maintain suitable habitat) and a population trend monitoring approach (which includes species population assessments) for insuring the viability of old growth species in compliance with the National Forest Management Act.  *See* 16 U.S.C. § 1604(f)(1).  For individual management actions within a forest, all relevant resource plans, contracts, and permits must be consistent with a forest's overall land management plan.  *Id.* § 1604(i).

-4-

B.     The Dixie National Forest Plan

As the Forest Service points out, the Plan imposes several obligations on the forest, with specific instructions for protecting the northern goshawk. It is undisputed that the Forest Service considers the northern goshawk a sensitive species. The duty to ensure viable populations "applies with special force to sensitive species." *Inland Empire Pub. Lands v. U.S. Forest Serv.*, 88 F.3d 754, 759 (9th Cir. 1996) (internal quotation marks omitted).

The Plan's requirements of particular relevance to this appeal are:

1.     establishing the northern goshawk as a management indicator species ("MIS"), Aplts' App. at A-16;[1]

2.     imposing forest-wide ongoing monitoring obligations for MIS, including the northern goshawk, *id.*;

3.     requiring annual nest surveys for goshawks, if the population is near the minimum level, and nest surveys every two to five years in project areas, *id.*;

4.     requiring "further evaluation" if there is a ten percent decline in the estimate forest-wide goshawk population size over a three-year

_____

[1] The National Forest Management Act regulations require the Forest Service to identify management indicator species that will be monitored because the species' "population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1) (2000). "Population trends of the management indicator species will be monitored and relationships to habitat changes determined." *Id.* § 219.19(a)(6).

period "and for loss of important habitat components," *id.*;

5.  requiring annual monitoring by means of a "[v]ariable strip transect," which involves the use of a linear transect of a predetermined distance, *id.*; and

6.  incorporating the requirements of the Utah Northern Goshawk Conservation Strategy and Agreement for the Management of [the] Northern Goshawk Habitat in Utah (the "Conservation Strategy"), which also imposes annual population monitoring requirements, *id.* at A-33 to A-51.

The purpose of the Conservation Strategy

> is to attain the goal of long-term conservation of the northern goshawk, its habitat and associated species throughout Utah through proactive management. Conservation of the Northern goshawk and its habitat will require improving degraded habitat conditions, maintaining and/or expanding populations. . . . Achievement of the desired habitat conditions contained within the strategy will provide that habitat is available to sustain viable goshawk populations in the State of Utah.

*Id.* at A-49.

The Conservation Strategy states, "when developing site specific prescriptions . . . the management recommendations for the northern goshawk in the Southwest United States (Reynolds et al. 1992) should be used." *Id.* at A-35. These recommendations are contained in a 1992 Forest Service report titled "Management Recommendations for the Northern Goshawk in the Southwestern

-6-

United States" (the "Reynolds Report"). *Id.* at A-52. The Reynolds Report's recommendations "represent the best available scientific information for forming the development of site prescriptions and should be considered a component of [the Conservation Strategy]." *Id.* at A-38 to A-39.

The Reynolds Report lists several "management recommendations" for the three types of goshawk habitat: nest areas, post-fledgling family areas, and foraging areas. Should there be logging, the Conservation Strategy recommends the thinning of understory trees rather than thinning from above. *Id.* at A-58. Specifically, the Plan seeks to maintain "[f]unctioning forested landscapes [to] provide habitat for the northern goshawk and its prey to support a viable population of goshawks in Utah." Aples' Supp. App. vol. I, at 8443.

The Conservation Strategy acknowledges that "[w]here site specific conditions differ from those described [in the Reynolds Report], the [Forest Service] must interpret and document [its] own specific value based on local data . . . using the 1992 habitat evaluation process [set forth in the Reynolds Report]." Aplts' App. at A-39.

In discussing the northern goshawk habitat, the Reynolds Report describes six vegetation structural stages ("VSS") of southwestern forests. Those structural stages range from VSS 1–in which a forest is dominated by grasses, forbs and shrubs–to VSS 5 (a "mature forest") and VSS 6 (an "old forest"). *Id.* at A-59.

The report states that desired forest conditions for sustaining northern goshawks and their principal prey species require twenty percent of VSS 6, such as older spruce-firs in the post-fledgling goshawk area and foraging area.

In 1982, when the Plan was adopted, the Forest Service estimated that there were 68 pairs of northern goshawks in the Dixie National Forest. The minimum viable population was established at 40 pairs. *Id.* at A-17. All parties agree that according to the most recent assessment in 2002, the goshawk population hovered at 20-30 pairs. *Id.* at A-70.

C.    The Griffin Springs Project

During 1994, the Forest Service first reviewed the possibility of implementing the Griffin Springs Project to allow commercial logging in the area. The Project area encompasses 11,835 acres located within the Escalante River and East Fork of the Servier River watershed. *Id.* at A-18.

The Project area's forest type consists primarily of Englemann spruce/subalpine fir, "with a strong component of aspen. Other vegetation types represented include sagebrush and mixed conifer." *Id.* The Forest Service determined that the area at issue contained high stand densities that contribute to declining tree growth and vigor, reduced aspen presence, and bark beetle infestations. *Id.* at A-22.

The Project's January 2002 EIS studied five alternatives to address these

concerns, including a no-action alternative. After the Forest Service completed the EIS, it issued a Life History and Analysis of Endangered, Threatened, Candidate, Sensitive, and Management Indicator Species of Dixie National Forest Report (the "Life History Report") in September 2002. The Forest Service then determined a Supplemental EIS ("SEIS") was required to consider the information provided in the Life History Report. On March 27, 2003, the Forest Supervisor selected Alternative 4 and issued a Record of Decision.

Alternative 4 outlines the following actions. Within the 669 acres of aspen, 112 acres will be subject to clear-cut logging, taking place in various "patches." Aples' Supp. App. vol. III, at 848. After the logging, prescribed fire techniques will be applied. Within the 8,030 acres of Englemann spruce/sub-alpine fir forest, approximately 3,307 acres would be subject to an "intermediate" level of commercial logging. Trees will be individually selected to "reduce stand densities while maintaining a variety of tree sizes." *Id.*

There will also be clear-cutting in 440 acres of the 3,307 acres of spruce/fir that are "stocked with scattered aspen clones." *Id.* In certain areas and for a period as long as seven years, trees that are infested with spruce beetles or that have been recently killed will be removed. There will be 88 acres of planting of Engelmann spruce seedlings. Finally, approximately seventeen miles of road would undergo reconstruction, and thirty-three miles of road would undergo

maintenance.

Despite the unchallenged status of the Reynolds Report as the best available science, the Forest Service relied on a study titled "Characteristics of Old-Growth Forests in the Intermountain Region" for certain calculations. According to the Forest Service, the Reynolds Report did not address all of the Project area's habitat attributes, and the intermountain region report represented better local data. *See* Aples' Br. at 26. The Forest Service maintains that the Project will create more goshawk habitat than currently exists. Although some foraging goshawks will be displaced, this displacement is not considered significant, according to the SEIS.

Similarly, the Forest Service looked to a study titled "The Northern Goshawk in Utah: Habitat Assessment and Management Recommendations" for its assertions that goshawks can breed successfully in the wake of clear-cutting, rather than following the Reynolds Report's requirement of twenty percent VSS 6. According to the Forest Service, the Project will actually improve goshawk habitat and viability over time. Aplts' Supp. App. at 39-44. The Record of Decision concludes that the project "will not negatively effect [sic] any of the MIS species that occur within the [P]roject area." Aplts' App. vol. III, at 850.

Here, Ecology Center filed a complaint seeking review of the Griffin Springs Project, contending that the SEIS does not conform with either NEPA or

the National Forest Management Act.  Ecology Center maintained first that the Forest Service had not disclosed sufficient data pursuant to NEPA to demonstrate how the Griffin Springs Project was consistent with the Forest Plan.  Second, Ecology Center argued that the Forest Service had failed to collect appropriate quantitative data regarding the northern goshawk and old growth species, in violation of the National Forest Management Act, which requires compliance with the Forest Plan.  In response, the Forest Service filed a motion to dismiss the complaint, which the district court granted.

For the reasons stated below, we affirm the district court's grant of the Forest Service's motion to dismiss the NEPA claim.  However, we reverse the district court's dismissal of the National Forest Management Act claim and direct the district court to remand the case to the Forest Service for the limited purpose of allowing the agency to review the Project pursuant to the appropriate rules.

## II. DISCUSSION

A.    Standard of Review

Under the APA, we will set aside a final agency action "only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence." *Am. Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 (10th Cir. 1998).  Our review is "highly deferential." *Valley Cmty. Pres. Comm'n v. Mineta*,

373 F.3d 1078, 1084 (10th Cir. 2004). Our duty is "to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002) (internal quotation marks omitted). We must determine whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oreg. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).

While our review is deferential, our inquiry must "be searching and careful." *Id.* (internal quotation marks omitted). Courts defer to the evaluations of agencies when the evidence presents legitimately conflicting, qualified views because "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* However, the agency action may be overturned

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 644 (10th Cir. 1990) (applying this standard of review).

B.    The NEPA Claim

Ecology Center first contends that the Forest Service failed to take a hard look at many critical issues concerning the potential adverse environmental impacts of the Project.  In addition, argues Ecology Center, the Final EIS and SEIS are based on a variety of expert conclusions that lack any credible hard quantitative data necessary to inform the public and the courts of the basis for these conclusions.

We disagree with Ecology Center's assertions.  It is useful to recall NEPA's twin aims:

> First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a hard look at the environmental consequences before taking a major action.

*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotation marks and citations omitted); *see Sierra Club v. Hodel*, 848 F.2d 1068, 1088 (10th Cir. 1988) (noting these twin aims of NEPA).

The Forest Service's EIS and SEIS satisfy the "hard look" requirement. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002) ("When a government agency prepares to take an action 'significantly affecting the quality of the human environment,' *this 'hard look' at*

*potential environmental impacts is accomplished through an EIS*.") (citing 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4) (internal quotation marks omitted) (emphasis added). The Forest Service has "discuss[ed] the purpose and need for the proposed action, environmental impacts resulting from the actions, unavoidable adverse environmental impacts, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and the amount of resources that must be devoted to the proposed action." *Id.* (citing 42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10). There is no suggestion that the Forest Service failed to solicit comments, or failed to consider the other alternatives in the EIS. *See* 42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. §§ 1501.7, 1502.10. The Forest Service engaged in the notice and comment process, and, after it prepared the Life History Report, it deemed the EIS incomplete. *See* 40 C.F.R. § 1502.9(b). It then prepared an SEIS to consider and incorporate the Life History Report's conclusions. *See id.* § 1502.9(c)(1).

"We apply a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [final] EIS are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002). The hard look requirement was satisfied through the EIS and SEIS. Here, Ecology Center unpersuasively

attempts to equate the lack of a "hard look" with a lack of "hard data." Because

the Forest Service has conformed with NEPA's procedural requirements, we "will

not second-guess the wisdom of the ultimate decision." *Id.* Accordingly, we

affirm the district court's grant of the Forest Service's motion to dismiss the

NEPA claim.

C.       The National Forest Management Act claim

Ecology Center's more substantive concerns emanate from the National

Forest Management Act. Ecology Center identifies a variety of shortcomings in

the Record of Decision, and concludes that it failed to comply with the Dixie

National Forest Plan. In particular, Ecology Center notes the Forest Service's

failure to maintain the Forest Plan's recommended requirements for the northern

goshawk's habitat. In addition, according to Ecology Center, the Record of

Decision makes no reference to the annual monitoring requirements for the

northern goshawk, as required by the Forest Plan. Finally, the Forest Service has

not explained why it will not follow the Conservation Strategy's preferred

recommendation to thin the understory trees. Aplts' App. at A-58. Although the

arguments raised by Ecology Center raise concerns, for the reasons explained

below, we need not reach them in this opinion.

1.       The 2000 Transitional Regulations Apply

Forest plans may require particular standards to be followed regardless of

later changes in the regulations.  But this is not the case here.  The Forest Plan "does not explicitly reference or adopt § 219.19 of the 1982 rules, concerning the selection and monitoring of management indicator species." *Utah Envt'l Cong. v. Bosworth*, 443 F.3d 732, 748 (10th Cir. 2006).  Therefore, we cannot read the Forest Plan to adopt the 1982 rules.  We thus must determine the standards under the appropriate regulation or transition rule.

The 1982 forest planning regulations at 36 C.F.R. Part 219 were superseded in November 2000, when new regulations were promulgated.  65 Fed. Reg. 67,568 (Nov. 9, 2000).  Under the transition provision of the 2000 regulations, the Forest Service was required to consider the "best available science" when implementing site-specific projects within a forest plan.  36 C.F.R. § 219.35(a) (2001).  The Griffin Springs Project is a site-specific implementation of the Dixie National Forest Plan.  *See Utah Envt'l Cong. v. Bosworth*, 372 F.3d 1219, 1221 (10th Cir. 2004) (noting that a Forest Service project must be consistent with the applicable Forest Plan).[2]

---

[2]The Department of Agriculture has proposed a variety of new rules for National Forest System planning since the original planning rules were adopted in 1979, and revised in 1982.  36 C.F.R. § 219 (1983).  In 1997, the agency appointed a Committee of Scientists to review the land and resource management planning process.  In a strategic planning exercise, the agency adopted the following objectives: to (1) ensure sustainable ecosystems, (2) provide multiple benefits for people within the capability of ecosystems, and (3) ensure organizational effectiveness.  U.S. Dep't of Agriculture, USDA Forest Service (GPRA) Strategic Plan (Washington, D.C. 1997).  *See* George Hoberg, *Science, Politics, and U.S. Forest Service Law: The Battle of the Forest Service Planning Rule*,  44 Nat. Resources J. 1, 12-17 (Winter 2004).

A 2004 Department of Agriculture interpretive rule explains that, during

the transition period from November 2000 until promulgation of a final rule (in

January 2005), only the transition provision of the 2000 regulations applied.  69

Fed. Reg. 58,055, 58,057 (Sept. 29, 2004).  Thus, neither the remainder of the

---

In October 1999, the Department of Agriculture proposed a new rule for National Forest System planning.  64 Fed. Reg. 54,074 (Oct. 5, 1999).  Relying on the 1997 report, and stating that "[t]he goals and principles for planning are those recommended by the Committee of Scientists," the new rule reiterated the agency's commitment to ecological sustainability. *Id.* at 54,080.  The final rule, issued in November 2000, included a section that replaced the species viability section of the earlier 1982 rule.  65 Fed. Reg. 67,568 (Nov. 9, 2000).  A transition provision in the 2000 regulations initially delayed application of its substantive provisions to project decisions until November 9, 2003. *See Bosworth*, 443 F.3d at 737; 36 C.F.R. § 219.35(d) (2001); 65 Fed. Reg. at 67,579.  "During the transition period," the Forest Service was required to "consider the best available science in implementing" a forest plan.  36 C.F.R. § 219.35(a) (2001).

In 2001, the new presidential administration moved quickly to review the new rules and in May 2001 suspended their application until May 2002. *See* 66 Fed. Reg. 27,552 (May 17, 2001).  On May 20, 2002, the Department of Agriculture again extended the transition date of the 2000 planning regulations.  67 Fed. Reg. 35,431 (May 20, 2002).  On December 6, 2002, the Forest Service proposed revisions to the 2000 regulations.  67 Fed. Reg. 72,770 (Dec. 6, 2002).  On September 10, 2003, the Forest Service published another "interim final rule," extending the transition date of the 2000 regulations "until the Department promulgates the final planning regulations published as proposed on December 6, 2002."  68 Fed. Reg. 53,294, 53,297 (Sept. 10, 2003).

Apparently, and unsurprisingly, this series of publications and promulgations created considerable uncertainty regarding the effect of the 2000 planning regulations, particularly the application of the "best available science" standard during the transition period.  As a result, on September 29, 2004, the Forest Service issued an "interpretative rule" stating that the agency should use the "best available science" standard during the transition period from November 2000 until promulgation of a final rule.  69 Fed. Reg. 58,055, 58,056 (Sept. 29, 2004).

The Forest Service subsequently published its final planning regulations.  70 Fed. Reg. 1022 (Jan. 5, 2005).  It is not surprising that "courts have expressed considerable confusion in applying the 2000 transition provisions." *Bosworth*, 443 F.3d at 745.

2000 planning regulations nor any of the 1982 regulations were binding on site-specific decisions during this period. *Id.* ("The 1982 rule is not in effect. . . . Projects implementing land management plans must comply with the transition provisions of Section 219.35, but not any other provision of the 2000 planning rule."). The preamble to the transition rule states that "projects proposed during the transition period should be developed considering the best available science." *Id.* at 58,056. The preamble also advises that "site-specific decisions entered into during the transition period are not to comply with the substantive provision of the 2000 planning rule." *Id.*

Given these guidelines, we have determined that the relevant date to consider is the date the final agency decision on the Project was made. *Bosworth*, 372 F.3d at 1221 n.1 (applying "[t]he regulations in effect at the time of the disputed Forest Service decision"); *see also Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 800 n.3 (9th Cir. 2005) (holding the 1982 regulations "applicable here because they were in effect when the plan revisions challenged in this lawsuit were prepared"); *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 118 (2d Cir. 2005) (holding the "relevant date for the purpose of determining which rule applies is the date the final agency decision was made"). Here, the Record of Decision was dated March 27, 2003. Therefore, we agree with the Forest Service that the 2000 transition rule was applicable to the Griffin Springs Project.

We next consider how to review the Forest Service's March 27, 2003

Record of Decision when the agency did not consider or mention the Project's

compliance under the 2000 transition rule.[3]  The Second Circuit recently resolved

this issue.  *See Forest Watch*, 410 F.3d at 118-19.  The court, relying on

*Bosworth*, 372 F.3d at 1221 n.1, determined that the 2000 transition rule applied

to an environmental assessment issued in 2002.  There, as here, the

> Forest Service nowhere considered or mentioned [the 2000 transition
> rule's "best available science"] standard during the administrative
> process.  Instead, the Forest Service reviewed the . . . Project for
> compliance only with the 1982 Rules and the [Forest] Plan. . . .  The
> exclusive application of the 1982 Rules and the failure to consider or
> mention the "best available science" standard amounted to conduct that
> is arbitrary and capricious.

*Forest Watch*, 410 F.3d at 119.  The court remanded the case to the district court

with instructions to enter an order vacating the Forest Service's approval of the

---

[3] Ecology Center failed to provide the Record of Decision, which is a required
portion of the record because it is the decision "from which the appeal is taken."  10TH
CIR. R. 10.3(C)(5).  The Forest Service attempted to rectify this deficiency when it
supplied an excerpt of the Record of Decision in its Supplemental Appendix and
Supplemental Excerpts.  *See* 10TH CIR. R. 30.2(A) ("An appellee who believes that the
appellant's appendix omits items that should be included may file a supplemental
appendix with its answer brief."); 10TH CIR. R. 10.3(B) ("When the party asserting an
issue fails to provide a record sufficient for considering that issue, the court may decline
to consider it.").  Neither party has provided a sufficient record or appendix in this case.

However, the excerpt of the Record of Decision makes no mention of the
applicable rules, and does not even include the phrase "best available science" anywhere
in the pages provided.  Rather, the Record of Decision appears to have applied the 1982
rules, referencing Management Indicator Species, which are not part of the 2000
transition rule's approach.  *See* Aples' Supp. App. vol. III, at 847-53  (pages 1, 3, 5-6, 9,
18-19 of ROD dated March 27, 2003); Aples' Supp. Excerpts vol. II, at 472-78 (same).
Because only an excerpt was provided, we assume that there are no other provisions
relevant to the Forest Service's argument.

project.

Here, at oral argument, the Forest Service acknowledged that it made no mention of the 2000 transition rule's applicability until this court issued its 2004 decision in *Utah Environmental Congress.* At that point in time, the Forest Service argued before the district court that the 2000 transition rule applied. The Forest Service points to nothing in the record regarding the district court's resolution of this issue. At oral argument, the Forest Service maintained that the district court's application of the 1982 regime was harmless error.

According to the Forest Service, it followed the "best available science," i.e., the Reynolds Report, in a manner consistent with the requirements of the applicable Forest Plan. Therefore, the Forest Service maintains that it necessarily complied with the 2000 transition provision and as such, the Second Circuit's decision in *Forest Watch* is inapplicable. However, the Forest Service's own actions suggest the Reynolds Report was not always treated as the best available science.

For example, Ecology Center vigorously disputes that the Forest Service applied the Reynolds Report's recommendations. It argues that the Griffin Springs Project will result in a percentage of old growth significantly lower than that required by the Conservation Strategy and the Reynolds Report. Similarly, Ecology Center points out that the Forest Service has not complied with the monitoring requirements of the Forest Plan, given the below-minimum-viability

population of the northern goshawk. Ecology Center also challenges the Project's compliance with the Forest Plan and Reynolds Report provisions regarding canopy closure, snags, and decaying logs that provide habitat for the northern goshawk. In addition, the Forest Service presents no long-range scientific evidence supporting its assertion that the Project will actually increase the number of northern goshawk in the Project area. Aplts' Supp. App. at 39-44. In the same vein, Ecology Center argues, the Forest Service's contention that there are no nesting goshawks in the Project area seems to contradict this logic.

At oral argument, the Forest Service contended that there was no doubt the "best available science" was applied here, suggesting that the Forest Service had discretion to decide what constituted the best available science. The Forest Service insists that a remand would be futile because "it is plain what those findings must be." Aples' Br. at 29 n.5 (internal quotation remarks omitted).

The Forest Service argues that "regardless of which regulatory scheme governs [our] review, on remand the Forest Service would be obligated to apply the 2005 regulations to this decision." *Id.* at 30 n.5. We note that the 2005 regulations *require* the Forest Service to

> document how the best available science was taken into account in the planning process; evaluate and disclose substantial uncertainties in that science; evaluate and disclose substantial risks associated with plan components based on that science and document that the science was appropriately arrogated and applied.

36 C.F.R. § 291.11(a)(1)-(4) (2005). These requirements underscore that the

"best available science" is *not* just whatever the Forest Service finds on the shelf. The Forest Service may satisfy the 2005 regulations' requirements through the use of "independent peer review, a science advisory board, or other review methods to evaluate to consideration of science in the planning process." *Id.* § 291.11(b).

At oral argument the Forest Service maintained that even though it did not argue the best available science standard below, that was harmless error because there is no question that it applied the best available science. It argues that because the plaintiffs have conceded that the Reynolds Report is the best available science, and that, in instances in which it has departed from that report, the agency has made a scientific judgment deserving of deference.

On this record, we must disagree. The Forest Service's approach is rather circular: while touting the Reynolds Report as the best available science, it is clear that the Forest Service has departed from its recommendations in several areas. It suggests that the Reynolds Report does not speak to aspen forests, yet aspen forests represent only a couple of hundred acres of this very predominantly spruce forest. Moreover, although the Reynolds Report suggests thinning from below, this project focuses on taking out the larger trees. Issues also exist about minimum canopy closures and the width of clearances. Thus, the Forest Service seems to use the Reynolds Report very selectively; when its conclusions differ with the report's "best available science" it simply argues that we must defer to

its expertise.

As noted in the Conservation Strategy, "[w]here site specific conditions differ from those described [in the Reynolds Report], the [Forest Service] must interpret and document [its] own specific value based on local data . . . using the1992 habitat evaluation process [set forth in the Reynolds Report]." Aplts' App. at A-39. On this record, we are unable to determine whether the Forest Service's reliance on other available data satisfies the "best available science" requirements. Rather than resolve these disputes on appeal, we conclude that a remand is appropriate so that the agency itself can have the first chance to apply its own standards.[4]

---

[4]    We note that we have not found, nor have the parties cited, any cases that define "best available science" in today's context. However, the term is used in other statutes that may, along with the regulations cited above, assist the Forest Service on remand.   In the context of the Endangered Species Act, 16 U.S.C. §§ 1531-44, the Secretary of the Interior must use "the best scientific and commercial data available." *Id.* § 1536(c)(1); *see also* 50 C.F.R. § 402.14(g)(8) (2005) ("In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation."). The Eighth Circuit has stated that, in the context of the Endangered Species Act, "[a]ll that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand.  They cannot ignore existing data." *Heartwood Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 436 (8th Cir. 2004) (citation omitted); *see also Kandra v. United States*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001) (In the context of the Endangered Species Act, "an agency cannot ignore available biological information . . . [and] it is presumed that agencies have used the best data available unless those challenging agency actions can identify relevant data not considered by the agency.") (citations omitted).

The proposed Threatened and Endangered Species Recovery Act uses the term "best available scientific data," which is defined as

scientific data, regardless of source, that are available to the Secretary at the time of a decision or action for which such data are required by this Act and that the Secretary determines are the most accurate, reliable, and relevant for use in that decision or action.

H.R. 3824, 109th Cong. § 3(a) (Sept. 29, 2005).

The Threatened and Endangered Species Recovery Act requires the Secretary to adopt regulations establishing criteria for this standard within one year of enactment, and these regulations must assure compliance with the Information Quality Act and assure that data "consists [sic] of empirical data" and "is [sic] found in sources that have been subject to peer review by qualified individuals recommended by the National Academy of Sciences to serve as independent reviewers for a covered action in a generally acceptable manner." *Id.*

The Safe Drinking Water Act of 1970, 42 U.S.C. §§ 300f *et seq*., also refers to the best available science. In 1996, the Safe Drinking Water Act was amended to state that

In carrying out this section, and, to the degree that an Agency action is based on science, the Administrator shall use--(i) the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and (ii) data collected by accepted methods or best available methods (if the reliability of the method and the nature of the decision justifies use of the data).

42 U.S.C. § 300g-1(b)(3)(A) (emphasis added); *see City of Waukesha v. E.P.A.*, 320 F.3d 228, 247 (D.C. Cir. 2003) (applying § 300g-1(b)(3)(A)).

The Magnuson-Stevens Fishery Conservation and Management Act requires the Secretary of Commerce to base his decisions regarding fishery management plans based on the "best scientific information available." 16 U.S.C. § 1851(a)(2). Under this statute, the best science available consists of the scientific findings available at the time the National Oceanic and Atmospheric Administration, on behalf of the Secretary, considers a problem. An agency is not required to collect additional evidence under the Magnuson-Stevens Fishery Conservation and Management Act. *Recreational Fishing Alliance v. Evans*, 172 F. Supp. 2d 35, 44 (D.D.C. 2001). The Ninth Circuit noted that "*the* best available *politics* does not equate to the *best available science* as required by the [Magnuson-Stevens Fishery Act]." *Midwater Trawlers Coop. v. Dep't of Commerce,* 282 F.3d 710, 720 (9th Cir. 2002) (emphasis added); *see also* Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361-1421(h) (2000) (adopting without defining the use of the best available scientific information requirement); Francesca Ortiz, *Candidate Conservation Agreements as a Devolutionary Response to Extinction*, 33 Ga. L. Rev. 413, 442 (1999) (discussing the listing process under the Endangered Species Act and stating: "[T]he best science may raise questions as to its objectivity and reliability. Who collected the data? Who interpreted it? Was there any underlying agenda other than pure science? What assumptions have been made? Have study results been corroborated? Are there

The demonstration of compliance with the applicable regulatory regime heightens the transparency and legitimacy of the Forest Service when it dons multiple hats: it is the institution that issues the legal provision, the institution that is subject to the provision, and the institution charged with the power to interpret the provision. For the Forest Service to assume it has satisfied all of its regulatory requirements based on a record that applied a now defunct regulatory regime is at odds with the agency's commitment to "produce responsible land management" and to attain the goal of sustaining social, economic, and ecological systems. 36 C.F.R. §§ 219.3, 219.10 (2005). Accordingly, we need not decide if Ecology Center's myriad of pointed arguments regarding Forest Services's failure to comply with the Forest Plan's habitat and monitoring requirements demonstrates that the Forest Service engaged in a clear error of judgment when it approved the Griffin Springs Project. We agree with the Second Circuit that we

conflicting conclusions? The list of questions can go on, but the point is that numerous factors impact all scientific studies; data collected may be incomplete or inaccurate, and, even if accurate, different people can interpret the data in different ways. Furthermore, information that is considered accurate today may prove inaccurate as new information comes to light.").

From these cases and the regulations it is clear that although the Forest Service need not collect new data, it should "seek out and consider all existing scientific evidence relevant to the decision" and it "cannot ignore existing data." *Heartwood*, 380 F.3d at 436. The Forest Service must determine which data "are the most accurate, reliable, and relevant," and that will be reviewed deferentially, but it still must be good science–that is reliable, peer-reviewed, or otherwise complying with valid scientific methods.

"may not 'properly affirm an administrative action on grounds different from those considered by the agency.'" *Forest Watch*, 410 F.3d at 119 (quoting *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999); and citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). "[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196. We hold that the Forest Service's "exclusive application of the 1982 Rules and the failure to consider or mention the 'best available science' standard amounted to conduct that is arbitrary and capricious," and we must reverse and remand on this limited basis. *Forest Watch*, 410 F.3d at 119.

### III. CONCLUSION

Accordingly, we AFFIRM the district court's grant of the Forest Service's motion to dismiss Ecology Center's NEPA challenges. However, we REVERSE the district court's dismissal of Ecology Center's claims under the National Forest Management Act. We REMAND the case to the district court and instruct it to enter an order vacating the Forest Service's approval of the Griffin Springs Project.